___ FILED  ___ ENTERED
___ LOGGED  ___ RECEIVED

3:13 pm, Feb 10 2023
AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ___rja___ Deputy

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**(SOUTHERN DIVISION)**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| v. | * | **Criminal Case No. 8:22-mj-1522-AAQ** |
| **MARLON RAMOS CASTRO** | * | |
| | * | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT**

On August 16, 2022, Marlon Ramos Castro appeared before the U.S. District Court for the District of Maryland for a bench trial on the charges of driving under the influence of alcohol, driving while impaired by alcohol, and consuming an alcoholic beverage in the passenger area of a car. For the reasons discussed below, I conclude that the United States has proved beyond a reasonable doubt that Mr. Ramos Castro violated the prohibition on driving while impaired by alcohol but has not sufficiently shown that Mr. Ramos Castro violated the prohibition on driving while under the influence of alcohol or consuming alcohol while in the passenger area of a car.

**PROCEDURAL HISTORY**

On August 19, 2021, a police official stationed at the Forest Glen Annex at Fort Detrick issued Mr. Ramos Castro three separate citations under 18 U.S.C. § 13 for 1) driving while under the influence of alcohol in violation of Md. Code Ann., Trans. § 21-902(a)(1), ECF No. 4; 2) driving while impaired by alcohol in violation of Md. Code Ann., Trans. § 21-902(b)(1), ECF No. 3; and 3) consuming an alcoholic beverage while in the passenger area of a vehicle in violation of Md. Code Ann., Trans. § 21-903(c), ECF No. 1.

On May 18, 2022, Mr. Ramos Castro was set to appear for an initial appearance on the allegations in the citations. Although Mr. Ramos appeared, an interpreter was not available. ECF No. 11. Mr. Ramos ultimately waived his initial appearance. *Id.* At that time, a bench trial was set before the undersigned to occur on July 19, 2022. On July 18, 2022, Mr. Ramos Castro, with the consent of the United States, moved to continue the trial until August 16, 2022. ECF No. 12. The Court granted the Motion. ECF No. 13. On August 11, 2022, the United States filed a Criminal Complaint raising the same three charges, which the Court signed. ECF No. 14-1, at 1.

A bench trial was ultimately held on August 16, 2022. Each of the witnesses who testified in support of the United States' case alleged that the events in question occurred two days after the date listed in the citations and in the Criminal Complaint. At the conclusion of the United States' presentation of its case, Mr. Ramos Castro moved for a judgment of acquittal primarily on this basis. The Court denied the Motion,[1] but invited both parties to provide additional authority and arguments on the question, if they found appropriate. In his supplemental filing, Mr. Ramos Castro conceded that the Court was correct in refusing to acquit him solely on this basis, but argued that the variance should be considered when assessing the credibility of the United States' witnesses.[2] ECF No. 14.

## FINDINGS OF FACT

Having received all exhibits related to the case, as well as having heard testimony from all witnesses presented, I make the following findings of fact. On August 19, 2021, at approximately

---

[1] "Where a particular date is not a substantive element of the crime charged, strict chronological specificity or accuracy is not required." *United States v. Kimberlin*, 18 F.3d 1156, 1159 (4th Cir. 1994) (citing *United States v. Morris*, 700 F.2d 427, 429 (1st Cir. 1983)).

[2] Given the Court's ruling on the Motion for Judgment of Acquittal and Mr. Ramos Castro's concession in his supplemental filing, I will not address the Motion in this decision.

5:50 a.m. Eastern Standard Time, a grey Toyota Camry attempted to enter the Brookville Gate at Forest Glen.  The car pulled up to the gate without committing any driving infractions.  After the car approached the gate, the officer stationed at the gate in the guard booth observed Mr. Ramos Castro in the vehicle's driver's seat.  The gate officer asked Mr. Ramos Castro in English for his driver's license, which Mr. Ramos Castro provided after the gate officer demanded it a second time.  According to the gate officer's testimony, Mr. Ramos Castro appeared "discombobulated", his eyes were red, and the officer smelled alcohol.  The gate officer failed to include any of these details in his initial sworn statement related to the incident.  The gate officer also saw a passenger sitting in the back of vehicle take a beer bottle from the front console between the two front seats and place it between his legs in the back of the car.  A third individual was also seated in the back of the vehicle.

    Based on these observations, the gate officer requested assistance.  In response to his request, three other officers arrived and took over the investigation.  After they arrived, the gate officer asked Mr. Ramos Castro to exit the car, which he did.  The gate officer noticed upon Mr. Ramos Castro's exit from the car that his pants were wet. Another officer later confirmed that Mr. Ramos Castro's pants were wet, as well as the fact that the driver's seat was wet.  Why his pants and the seat were wet, as well as what the liquid was, remains unclear.  One of the three officers who arrived asked Mr. Ramos Castro for his driver's license, again in English.  Mr. Ramos Castro, in response, began searching through his car.  The gate officer then informed the second officer that he had Mr. Ramos Castro's license.  The second officer also observed that Mr. Ramos Castro's words were slurred and that there was a smell of alcohol emanating from his vehicle.  The second officer asked Mr. Ramos Castro if he had drunk alcohol that evening, to which Mr. Ramos Castro responded in the negative.  At some point during the conversation, the second officer became

aware that Mr. Ramos Castro and the two passengers had recently finished employment for the evening.

The second officer then asked Mr. Ramos Castro to walk to the rear of the vehicle so that the officer could conduct a field sobriety test. However, during the administration of the test, Mr. Ramos Castro was unable to follow the second officer's instructions which, again, were in English. The second officer then asked for a third officer to assist him by translating his instructions into Spanish. The third officer had some knowledge of Spanish, though the degree remains unclear. Mr. Ramos Castro remained unable to follow the instructions. During the interaction, Mr. Ramos Castro appeared to sway from side to side and lean against the back of the vehicle he had been driving.

At that time, the second officer called a fifth officer who the second officer believed might be able to better translate the second officer's instructions. Upon arriving, the fifth officer observed that despite being instructed to remain seated, Mr. Ramos Castro kept standing up. The instructions to remain seated were given in Spanish. Importantly, although the fifth officer has some knowledge of Spanish, the degree remains unclear. The fifth officer described himself as having a limited ability to read and write Spanish, but an ability to speak it proficiently. The fifth officer did not speak Spanish before the age of twelve, but increasingly began to speak Spanish after that time. The fifth officer admitted that he has a strong English accent and that other Spanish speakers have trouble understanding him. The fifth officer also conceded that this was the first occasion on which he had served as a translator for the purposes of a field sobriety test. The fifth officer attempted to translate the instructions for the field sobriety test, but Mr. Ramos Castro still did not understand them; at one point, Mr. Ramos Castro, rather than following the second officer's hands with his eyes, attempted to mirror the officer's actions with his own hands. Additionally,

Mr. Ramos Castro kept placing his hands in his pockets, which interfered with the test. It is unclear if Mr. Ramos Castro ever understood the second officer's instructions.

Although he was unable to successfully administer the test, the second officer arrested Mr. Ramos Castro. Mr. Ramos Castro was then transported to the patrol room at Forest Glen. While being transported, Mr. Ramos Castro spoke to himself on multiple occasions. From there, police officials transported Mr. Ramos Castro to the Montgomery County 3rd District Police Station in Silver Spring, Maryland for the purpose of administering a breath test using an Intoxilyzer. Ultimately, police officials did not or were not able to administer a test using the Intoxilyzer.

After Mr. Ramos Castro was arrested and the two other passengers exited the vehicle, the second officer drove the vehicle to a secure location, conducted an inventory of the vehicle, and took pictures of the items therein. The second officer found in the rear of the vehicle eleven empty bottles of beer, two partially full bottles of beer, and five full bottles of beer that were unopened. One of the partially full bottles of beer was on the floor on the rear passenger side, while another was in the rear driver's side door.

## APPLICABLE STANDARD

"Under the Constitution, an accused is protected from conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *United States v. Stavrakis*, No. ELH-19-00160, 2020 WL 607036, at *2 (D. Md. Feb. 7, 2020) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)); *see also United States v. Gaudin*, 515 U.S. 506, 522 (1995).

## CONCLUSIONS OF LAW

**I.** **Although the United States Has Presented Sufficient Evidence to Support Mr. Ramos Castro's Conviction for Driving While Impaired by Alcohol, the Evidence Is Insufficient to Demonstrate that Mr. Ramos Castro Was Driving While Under the Influence of Alcohol.**

5

Section 21–902(a)(1) of the Maryland Transportation Article prohibits a person from driving while under the influence of alcohol. Subsection (b)(1) of the same section prohibits a person from driving while impaired by alcohol. Md. Code Ann., Trans § 21–902.

Maryland courts have looked to the Maryland State Bar Association Standing Committee on Pattern Jury Instructions when examining each of the offenses. *Turner v. State*, 181 Md. App. 477, 489-90, 956 A.2d 820, 828 (2008). The instructions provide that, if the defendant is charged with either crime, the State must prove:

> (1) that the defendant drove, operated, or moved a vehicle [or was in actual physical control of a vehicle]; and
> (2) that, at the time, the defendant was either under the influence of alcohol or impaired by alcohol.

MPJI–CR 4:10. "The pattern instruction describes the distinction between 'under the influence' and 'while impaired' as being one of degree." *Turner*, 956 A.2d at 828. "Driving 'under the influence' is the more serious of the two offenses and requires that the alcohol that the person has consumed has 'substantially impaired the person's normal coordination.'" *Id*. "By contrast, driving 'while impaired' requires that the alcohol that the person has consumed 'has impaired normal coordination to some extent.'" *Id*.

The evidence presented in the case clearly establishes that Mr. Ramos Castro was driving the vehicle – a point not in dispute – and that he had consumed alcohol at some point, which had impaired his coordination to some extent. Officers who observed Mr. Ramos Castro noted that: 1) his words were slurred; 2) he was swaying from side to side; 3) an odor of alcohol was emanating from the vehicle in which he was seated; 4) he leaned against the vehicle while speaking with officers; 5) his eyes were red; 6) he appeared discombobulated; and 7) that multiple bottles of alcohol were found in the vehicle in which he was seated. *See Yoder v. State*, No. 11-K-16-5313,

2017 WL 5022610, at *1 (Ct. Spec. App. Md. Nov. 3, 2017) ("[the defendant] hit the curb so hard that his vehicle 'shook;' that the officer smelled a strong odor of alcohol coming from [the defendant's] vehicle as he approached the driver's side window; that [the defendant's] reactions and movements in response to the officer's questions appeared to be 'delayed' and 'slower than normal;' that [the defendant's] speech was 'slightly mumbled;' that [the defendant's] eyes were bloodshot and glassy; that [the defendant] was 'staggering back and forth' as he walked from his vehicle to the sidewalk; that [the defendant] swayed as the officer explained the field sobriety tests; and that [the defendant] admitted drinking three shots of alcohol earlier in the evening. Based on this evidence, the trial court could reasonably find that [the defendant's] normal coordination was impaired to 'some extent' by alcohol.").

However, the evidence presented is insufficient to prove that Mr. Ramos Castro was driving under the influence of alcohol, i.e., that alcohol substantially impaired his coordination. In addition to the aforementioned facts, the United States relies significantly on the fact that Mr. Ramos Castro failed to respond to multiple officers' commands. However, the import of Mr. Ramos Castro's failure to respond is limited by the fact that the commands were either communicated in English or by individuals who have limited Spanish proficiency. For example, although Mr. Ramos Castro was unable to complete the field sobriety test, it is unclear whether this failure was the result of the degree of his intoxication, or his inability to understand instructions which were communicated to him in a language which he did not understand. Although different individuals with varying Spanish language abilities attempted to communicate with him, their testimony left significant doubt as to whether they could effectively communicate with Mr. Ramos Castro – particularly relating to the technical aspects of a field sobriety test. In fact, as the translating officer, whom the officers believed had the strongest grasp of Spanish, admitted: 1) he

7

has a strong English accent which prevents other Spanish speakers from understanding him; 2) he has never received any training or certification in translation; and 3) he had never administered a field sobriety test in Spanish.

In addition to the confusion surrounding Mr. Ramos Castro's understanding of the officers' commands, it is undisputed that Mr. Ramos Castro was able to drive up to the gate at Forest Glen without committing any driving infraction.  Finally, although the discrepancy in dates as to when the offense occurred does not justify dismissal of the charges, the fact that each of the officers who testified on behalf of the United States testified that the event occurred on the wrong date undercuts to some degree the credibility of their testimony.  Together, these facts leave reasonable doubt as to whether Mr. Ramos Castro was substantially impaired by alcohol while operating a motor vehicle.

> **II.   The United States Has Presented Insufficient Evidence to Demonstrate that Mr. Ramos Castro Consumed Alcoholic Beverages While in the Passenger Area of a Vehicle.**

Section 21-903(c) of the Transportation Article provides that "[a] driver of a motor vehicle may not consume an alcoholic beverage in a passenger area of a motor vehicle on a highway." Md. Code Ann., Trans. § 21-903(c).  Although there was alcohol in the vehicle in which Mr. Ramos Castro was observed and it appears that he had consumed alcohol at some point during the evening, the evidence presented leaves reasonable doubt as to whether Mr. Ramos Castro consumed alcohol in the vehicle.

Importantly, Mr. Ramos Castro was accompanied in the vehicle by two other passengers who were each closer to the alcohol found.  When the inventory of the vehicle was taken, all of the beer bottles were found in the rear of the vehicle where the two other passengers had been seated.  Likewise, although two bottles were found open, both were found in the rear of the vehicle.

While the United States has argued that one of the officers observed a passenger in the rear take one of the bottles from between the two front seats, this alone does not establish that Mr. Ramos Castro had been drinking from the bottle. The passenger in the rear of the vehicle may well have been drinking from the bottle given the fact that he was in close proximity to the other empty bottles of alcohol. Further, the fact that the only person observed possessing the bottle was someone other than Mr. Ramos Castro actually undercuts the government's position. Together, the evidence the United States has presented is insufficient to prove Mr. Ramos Castro's violation beyond a reasonable doubt.

## JUDGMENT

Accordingly, for the aforementioned reasons, Mr. Ramos Castro is guilty of violating the prohibition on driving while impaired by alcohol, but is not guilty of violating the prohibition on driving while under the influence of alcohol or consuming alcohol while in the passenger area of a car.

Date: December 7, 2022

\_\_\_\_/s/_____
Ajmel A. Quereshi
U.S. Magistrate Judge